NOTICE

Decision filed 04/07/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190422-U

NO. 5-19-0422

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Monroe County. |
| | ) | |
| v. | ) | No. 17-CF-136 |
| | ) | |
| GLENN PATRICK WARD, | ) | Honorable |
| | ) | Dennis B. Doyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court did not abuse its discretion in admitting propensity evidence of other sexual crimes committed by the defendant. The evidence presented at the defendant's trial was sufficient to sustain a conviction for all 15 counts of predatory criminal sexual assault of a child.

¶ 2     The defendant, Glenn Patrick Ward, was convicted of 15 counts of predatory criminal sexual assault of a child following a jury trial. The trial court sentenced the defendant to an aggregate term of 150 years' imprisonment. The defendant appeals his convictions, arguing that the trial court erred in admitting propensity evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2016)) and that the State failed to produce sufficient evidence to convict the

1

defendant on all 15 counts of predatory criminal sexual assault of a child. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On October 11, 2017, the State charged the defendant by criminal information with 15 counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)).  Each count alleged that the defendant, who was 17 years of age or older, committed an act of sexual penetration by placing his fingers in the vagina of A.A., who was under 13 years of age at the time of the offenses. Each count further alleged that the crimes charged occurred on or between January 1, 2012, and December 31, 2012. The defendant is A.A.'s great-uncle. The incidents allegedly occurred in two locations, the defendant's apartment on Hamacher Street in Waterloo, Illinois, and in a shed behind A.A.'s house that had been converted into a bedroom.

¶ 5                                 A. Pretrial Proceedings

¶ 6    Prior to trial, the State notified defense counsel via email that the State intended to introduce the testimony of K.S., the niece of the defendant's ex-wife. The State claimed the testimony was admissible pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2016)). In 1998, K.S. had accused the defendant of digitally penetrating her on three occasions. These incidents allegedly occurred in Poplar Bluff, Missouri. The State provided the defendant with a summary of K.S.'s accusations.

¶ 7    Both the State and the defendant filed motions *in limine* regarding the admission of K.S.'s testimony. Initially, the trial court denied the State's motion and granted the defendant's motion. The trial court found that the timeliness of the State's disclosure was

2

not reasonable as the defendant's trial was scheduled to begin the following week. The State moved for a continuance to allow additional time for discovery concerning the propensity evidence. The trial court granted this motion.

¶ 8 Further discovery was conducted, and the State filed a second motion *in limine* to admit K.S.'s testimony. In response, the defendant filed a motion *in limine* arguing that K.S.'s testimony was too removed from the present testimony to be of probative value. The defendant further argued that the allegations were investigated and found to be without merit and the defendant was never charged with an offense related to the accusations. Finally, the defendant argued that the State had not provided all "reports, statements, investigative notes, medical records and/or other documentation" regarding the allegations made by K.S. The defendant further claimed that many of the records no longer existed because the records were more than 20 years old and/or had been destroyed. The defendant also alleged that the Missouri Department of Social Services Children's Division representatives who had investigated the case were deceased or could not be located.

¶ 9 The trial court held a hearing on the parties' motions. At this hearing, K.S. testified about three incidents where the defendant allegedly inserted his fingers into K.S.'s vagina. The defendant cross-examined K.S. concerning the allegations. On cross-examination, K.S. indicated that no charges were ever filed against the defendant. K.S. testified that in addition to the police, K.S. had disclosed the incidents to several individuals, including K.S.'s mother, K.S.'s grandmother, K.S.'s Aunt Carla (the defendant's ex-wife), and a pastor at her family's church. K.S. indicated that she was unaware of the pastor's whereabouts. K.S. also met with Dr. Claudia Preuschoff, who performed a "safe" exam on

3

K.S. She also indicated that she attended counseling with Dr. Jane Niskey and Sharon Cross. K.S. testified that she had spoken privately with Dr. Preuschoff and Dr. Niskey, and that they no longer had records regarding K.S.'s case or any recollection of what K.S. had disclosed to them.

¶ 10     After hearing the arguments of the parties, the trial court granted the State's motion *in limine* and denied the defendant's motion *in limine*. In granting the State's motion, the trial court remarked that K.S. "certainly seemed like she could be credible." The trial court found that the allegations made by K.S. were similar to the facts alleged by A.A. The trial court noted that K.S. and A.A. were similar ages; they had a similar relationship with the defendant; and K.S. and A.A. alleged a similar sex act. The trial court also noted that the allegations occurred under similar circumstances, where the defendant was home alone with both A.A. and K.S. The trial court acknowledged that the 14-year time period between the allegations made by K.S. and A.A. was an "extreme long period of time." The trial court further acknowledged that an investigation into the K.S. allegations had been done and that the defense was not able to interview certain witnesses and that records regarding the case had been lost or destroyed. The trial court concluded that after weighing the factors, the "extreme similarity" of the allegations made the probative value of the evidence outweigh the prejudicial effect.

¶ 11                      B. The Jury Trial

¶ 12     Officer Eric Zaber testified that he became involved in the case after receiving information that A.A. had been sexually abused. Officer Zaber traveled to Waterloo Jr. High School and met with A.A.'s parents as well as the school's principal, assistant

4

principal, and guidance counselor. Officer Zaber did not interview A.A. but did set up an interview for A.A. at the Child Advocacy Center (CAC).

¶ 13   After the CAC interview, Officer Zaber interviewed the defendant at the home of his mother, Bernice Ward, in Broseley, Missouri. The interview with the defendant was recorded, and an excerpt of the interview was played for the jury. The interview excerpt provided as follows.

¶ 14   Officer Zaber informed the defendant that he was not under arrest and read him his *Miranda*[1] rights. Officer Zaber advised the defendant that he had spoken with A.A., who informed Officer Zaber that the defendant lived with A.A.'s family and was "fond" of A.A. Officer Zaber stated that he wanted to "talk to [the defendant] about that, and see if anything had happened" that Officer Zaber "should know about." The defendant replied, "You talking about a sexual thing here?" Officer Zaber told the defendant that Officer Zaber had gotten that impression from A.A., "but never intercourse or anything."

¶ 15   The defendant confirmed that he had lived in an apartment with two roommates before moving into the shed behind A.A.'s house in 2012. Officer Zaber asked the defendant if he was ever alone with A.A. The defendant told Officer Zaber that A.A. used to spend the night with the defendant and that he and A.A. watched movies together. The defendant stated that he had animated movies such as "Ice Age." He also had action and "sci-fi" movies that he liked to watch, but no pornographic movies.

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

5

¶ 16 When asked if the defendant had ever seen A.A. without clothes on, the defendant stated that A.A. would sometimes change her clothes when getting ready for school. He also stated that A.A. would stay the night at his apartment, and that he would run a bath for A.A. The defendant stated that A.A.'s father asked the defendant to watch A.A. while she took a bath because "sometimes she gets *** in trouble and, everything, she'll fall asleep or something." The defendant further stated that he helped A.A. dry off after a bath and helped her put on clothes. The defendant denied touching A.A. in an inappropriate or sexual manner.

¶ 17 Following his interview with the defendant, Officer Zaber investigated other allegations made against the defendant. Zaber testified that A.A.'s father provided Officer Zaber with information that when the defendant lived with his sister, Barbara Weber, "there may have been an incident where [the defendant] left the house quickly." A.A.'s father had suggested that the defendant molested one of Weber's children. Officer Zaber spoke with Weber who informed Officer Zaber that nothing had happened. Officer Zaber also interviewed K.S. in Poplar Bluff and prepared a report of the interview.

¶ 18 On cross-examination, Officer Zaber testified that he went to A.A.'s residence but was unable to observe the shed because A.A.'s father did not allow Officer Zaber to enter the house. Officer Zaber also testified that he did not visit the Hamacher apartment. As to A.A.'s allegations, Officer Zaber was not provided with specific times for the allegations.

¶ 19 A.A. testified that the defendant first touched her inappropriately in February 2012, when A.A. was nine years old. During this time, A.A. often spent the night at the Hamacher apartment. When A.A. spent the night, she slept in the defendant's bed with the defendant.

6

A.A. slept in the clothes she had worn that day, and the defendant slept in either boxers or was naked.

¶ 20    A.A. testified that the first time she recalled something inappropriate happening was in the defendant's bedroom. The defendant asked A.A. to remove her clothes, and A.A. laid on the bed. The defendant inserted his fingers into A.A.'s vagina, then put his tongue in her vagina. The incident lasted approximately 10 minutes. Afterwards, the defendant told A.A. not to tell anyone. A.A. testified that the defendant committed these acts "three to seven times" but "probably closer to three." A.A. specifically recalled that these acts occurred on at least three occasions and that each incident occurred the same way. During these incidents, the defendant either wore boxers or was naked. A.A. testified that the defendant bathed her and dried her off, "sometimes before, sometimes after" the incidents occurred. The defendant also helped A.A. with getting dressed. A.A. stated that when she was at home during this time period, she took showers and did not require assistance with bathing or getting dressed.

¶ 21    In the "middle of Spring or early Summer" of 2012, the defendant moved into the shed behind A.A.'s house. In the shed, the defendant had a bed with a metal headboard and footboard, a dresser with a TV, a desk with a computer, and a "pile of junk." The shed had no bathroom or upstairs. A.A. testified that while the defendant lived in the shed, she spent the night with the defendant and slept in his bed. A.A. wore her clothes, and the defendant slept either in boxers or was naked.

¶ 22    A.A. testified that the defendant continued to touch her inappropriately in the shed. A.A. stated that the incidents were similar to the incidents at the Hamacher apartment.

7

When A.A. visited the defendant in the shed, they had "a normal conversation like nothing had ever happened" and often played computer games. The defendant also played the movie, Ice Age, for A.A. While Ice Age was playing, the defendant asked A.A. to remove her clothing, and A.A. laid on the bed. The defendant inserted his fingers and then tongue into A.A.'s vagina. Afterwards, A.A. would get dressed, and the defendant would "tidy up" the bed. A.A. then laid in the bed and either fell asleep or "stay[ed] up for a little bit." A.A. testified that on approximately three occasions, the defendant bound her arms and on another two occasions, bound both her arms and legs. The defendant used either a rope or belt to bind A.A. When the defendant bound only A.A.'s arms, he inserted his finger and tongue into A.A.'s vagina. When the defendant bound A.A.'s arms and legs, he only inserted his finger into her vagina. A.A. estimated that the incidents in the shed occurred 10 times, "might be more." A.A. affirmed that on five occasions at least some part of her body was bound. She estimated that on "five to eight" occasions, her limbs were not bound.

¶ 23    The sexual acts ended in October 2012. A.A. testified that between the incidents at the Hamacher apartment and the shed, the defendant digitally penetrated her "[a]round 15" times.

¶ 24    Initially, A.A. did not tell anyone about the sexual acts because she was "trying to process what had happened" and "didn't understand what had happened." When A.A. was in the sixth grade, she told a friend "what had happened" with the defendant but asked the friend to not tell anyone. In the seventh grade, A.A. made the same disclosure to another friend, but again, asked this friend to not tell anyone. Finally, in the eighth grade, A.A. made a disclosure to a third friend. Although A.A. asked this friend not to tell anyone, the

8

friend informed the school guidance counselor about what A.A. had disclosed. A.A. spoke with the guidance counselor, and A.A.'s parents were notified. Finally, A.A. testified that she did not know K.S.

¶ 25    On cross-examination, A.A. admitted that she had told the guidance counselor that the defendant digitally penetrated her 20 to 30 times but told the CAC worker that it occurred "maybe 15" times. A.A. testified that she recalled that the abuse happened "around 15 times." A.A. also admitted that she told the guidance counselor that the sexual acts first occurred in the shed and then the defendant's apartment. A.A. stated her memory was "foggy" and that she was under emotional distress at the time. Following these incidents, A.A. was not subjected to any medical or psychological tests. Furthermore, A.A. never attended professional counseling but often talked to her guidance counselors.

¶ 26    Timothy Joellenbeck, the defendant's former coworker and roommate, testified that he lived with the defendant at the Hamacher apartment for approximately two years. Joellenbeck's wife also stayed at the apartment, and another individual lived in the basement. Joellenbeck testified that between January 1, 2012, and the summer of 2012, A.A. spent the night at the apartment with the defendant four to five times per month. Joellenbeck further testified that he often worked overnight shifts and was away from the apartment at night, but his wife would have been at the apartment. Joellenbeck stated that he never witnessed "anything illicit" occur between the defendant and A.A., but also stated that the defendant's bedroom door was always closed whenever the defendant and A.A. were in the defendant's bedroom.

¶ 27     Prior to K.S.'s testimony, the trial court, at the defendant's request, read a limiting instruction to the jury regarding propensity evidence. The trial court informed the jury that K.S. would testify about conduct involving the defendant other than that charged in the information. The trial court instructed the jury that the evidence was being received on the issue of the defendant's propensity to commit a crime and may be considered by the jury only for that limited purpose. The trial court further instructed the jury that they were to determine whether the defendant was involved in the conduct and what weight to give the evidence on the issue of the defendant's propensity to commit a crime.

¶ 28     K.S. testified that in 1998, she had several "uncomfortable" encounters with the defendant. At the time, K.S. was nine years old. K.S. stated that these encounters happened "three to four" times that she could recall, three times with specificity. K.S. further stated that each of these encounters occurred approximately one week apart from one another during the month of July.

¶ 29     K.S. testified that she lived in Poplar Bluff with her parents. The defendant was married to K.S.'s Aunt Carla. K.S. and her parents lived in a basement apartment, and the defendant and Carla lived in an upstairs apartment in the same building. In the summer of 1998, K.S.'s mother occasionally had difficulty finding a babysitter for K.S., and the defendant offered to watch K.S. whenever a babysitter was unavailable. When the defendant acted as the babysitter for K.S., the "situations took place." K.S. described three incidents where the defendant committed acts of sexual penetration against her.

¶ 30     In the first incident, the defendant asked K.S. if she knew what the female and male sex organs looked like. The defendant drew pictures of people and their anatomy and of

10

people performing sex acts on each other. Next, the defendant played a pornographic movie for approximately 15 to 20 minutes. The defendant then instructed K.S. to go into the bathroom and "wipe [her] private parts down." After K.S. did this, the defendant told K.S. to go into the bedroom and lie on the bed. The defendant entered the bedroom, wearing a t-shirt and underwear. The defendant laid on the bed next to K.S. and instructed her to remove her pants. After K.S. complied, the defendant inserted his fingers into K.S.'s vagina. The incident lasted a "few" minutes until K.S. told the defendant that it hurt. The defendant told K.S. to get dressed, and they went into the living room where the defendant turned on the Disney movie "Flubber." K.S. testified that the defendant told her that she could not tell anyone what had happened. The defendant stated that everyone would be mad at K.S. and the defendant if they knew what had happened and that Carla would "leave" the defendant. The defendant also told K.S. that her mother had been sexually abused by K.S.'s grandfather. No one believed K.S.'s mother when she disclosed the abuse. The defendant told K.S. that no one would believe her either.

¶ 31    In the second incident, the defendant played another pornographic movie for K.S. and again told K.S. to clean herself in the bathroom. The defendant then told K.S. to go into the bedroom and lie on the bed. The defendant laid on the bed next to K.S., instructed her to remove her "bottoms," and inserted his fingers into her vagina. After the defendant stopped, he told K.S. to go into the living room, and the defendant played Flubber for K.S. The defendant had "pretty much the exact same conversation" with K.S. about not telling anyone.

11

¶ 32    On the day of the third incident, K.S. had argued with her mother because K.S. did not want to go to the defendant's apartment. K.S.'s mother "spanked" K.S. and told her that she had to go to the defendant's apartment that day. At the defendant's apartment, the defendant played a pornographic movie and instructed K.S. to clean herself in the bathroom. This time, K.S. locked herself in the bathroom. The defendant knocked on the door, asked K.S. if she was okay. He told K.S. to exit the bathroom. K.S. exited the bathroom and "was being grumpy." The defendant began playing with K.S.'s hair and tried to joke with her. The defendant subsequently told K.S. to go into the bedroom. K.S. complied and laid on the bed. The defendant instructed K.S. to remove her shorts, but she refused. The defendant removed K.S.'s shorts and inserted his fingers into her vagina. After the defendant stopped, he played the movie Flubber for K.S. Subsequently, they had the same conversation about not telling anyone.

¶ 33    Shortly after the third incident, K.S. and her family moved to another part of town, and the defendant and Carla moved to Broseley, Missouri. After K.S. and her family moved into their new home, K.S. disclosed the defendant's sexual acts to her mother. K.S.'s mother contacted the Poplar Bluff Police Department, and K.S. made a statement at the police station. K.S. later underwent a "safe" exam. K.S. testified that she did not know A.A.

¶ 34    On cross-examination, K.S. indicated that she was aware the Poplar Bluff Police Department investigated her accusations and that, to her knowledge, no charges were ever filed against the defendant. K.S. affirmed that Officer Zaber had requested her to sign an authorization form to obtain counseling records, but K.S. never returned the form.

12

¶ 35 After the State rested its case, the defendant moved for a directed verdict. The trial court denied the defendant's motion, and the defendant presented his case.

¶ 36 The defendant recalled Officer Zaber as a witness. As part of his investigation, Officer Zaber recorded a phone conversation between A.A. and the defendant on May 8, 2017. The conduct leading to the charges in this case was not discussed during the phone call. The defendant introduced a copy of the recorded phone call, however, for the purpose of showing A.A.'s demeanor during that time.

¶ 37 The defendant testified that when A.A. was nine years old, she often accompanied the defendant wherever he went. The defendant further testified that A.A. spent the night with him at his apartment and in the shed, but with her parents' knowledge and permission. The defendant indicated that A.A.'s younger brother also spent the night with the defendant in the shed "a couple of times." The defendant denied ever touching A.A. in an inappropriate way and denied that he wore boxers. The defendant testified that he "could not come up with any kind of explanation as to why [A.A.] would make an accusation like this."

¶ 38 As to K.S., the defendant denied ever babysitting K.S. and claimed that he only spent a limited amount of time with her. The defendant testified that K.S. had access to his apartment and would come over because she liked watching movies. The defendant further testified that K.S.'s mother had asked the defendant to run K.S. a bath when K.S.'s mother could not get home early enough. K.S.'s mother allegedly asked the defendant to do this because K.S. would "make the water too hot and scalded herself." The defendant testified that during July 1998, he worked for the first two weeks until he was injured at work. The

13

defendant was then confined to his home for approximately five weeks. The defendant denied touching K.S. in an inappropriate way.

¶ 39    On cross-examination, the defendant testified that he did not believe it was inappropriate to bathe A.A. The defendant stated that he would check on A.A. at her father's request and that he would help dry her with a towel because she did not "dry off sufficiently" in the bathroom. The defendant further testified there was "nothing inappropriate" about A.A. sharing a bed with him. As to K.S., the defendant believed that K.S. made up the allegations against him because she had asked to live with the defendant and Carla. The defendant claimed that K.S. was having problems with her parents and no longer wanted to live with them. The defendant and Carla decided that they could not afford to have K.S. live with them and that it was best for K.S. to stay with her parents. The defendant testified that approximately two weeks later, K.S. made the accusations against the defendant.

¶ 40    Finally, the defendant called his sisters, Beverly Menke and Barbara Weber, as well as his mother, Bernice Ward, as witnesses. Menke testified that the family had a lot of family gatherings and that A.A.'s family attended most of the gatherings. Menke had not seen A.A. or her father since the allegations against the defendant had been made. Weber testified that she had been contacted by Officer Zaber about a time when the defendant lived with Weber in 1993. Weber further testified that Officer Zaber informed her that an accusation had been made that there was "something inappropriate" that had occurred with one of Weber's daughters while the defendant lived with Weber. She stated that she had questioned her daughters, who informed Weber "absolutely nothing had happened."

14

¶ 41 Bernice Ward testified that A.A. had visited Bernice's house for three weeks in 2013 and two weeks in 2014. Bernice confirmed that the defendant was at her house during those times. When A.A. visited, Bernice never observed the defendant inappropriately touch A.A. Bernice testified that she kept in regular contact with Carla and had seen her as recently as two weeks before the trial. Bernice further testified that Carla had never mentioned K.S.'s allegations against the defendant.

¶ 42 After the close of evidence, the defendant moved for a directed verdict. The trial court denied the defendant's motion. After the parties made their closing arguments, the trial court read the jury instructions applicable to the case, which included the limiting instruction regarding propensity evidence. Following deliberations, the jury found the defendant guilty on all 15 counts of predatory criminal sexual assault of a child.

¶ 43 The defendant filed a posttrial motion for judgment notwithstanding the verdict or a new trial. The defendant argued that the State failed to prove the defendant guilty beyond a reasonable doubt and failed to prove every material allegation in the information beyond a reasonable doubt. The defendant also argued that the trial court erred in allowing K.S. to testify. The trial court denied the defendant's motion.

¶ 44 The defendant was sentenced to 10 years in the Illinois Department of Corrections for each conviction to be served consecutively, for an aggregate term of 150 years, followed by 3 years of mandatory supervised release. This appeal followed.

¶ 45                                II. ANALYSIS

¶ 46         A. Admission of Propensity Evidence under Section 115-7.3

15

¶ 47    The defendant contends that the trial court erred in admitting the testimony of K.S. to show the defendant's propensity to commit predatory criminal sexual assault. The defendant argues that the trial court abused its discretion in admitting this evidence because K.S.'s allegations were approximately 14 years old. The defendant further argued that by the time of trial, "many of the details and witnesses pertinent to the investigation were unavailable, making K.S.'s highly prejudicial testimony essentially unimpeachable."

¶ 48    Generally, evidence of other crimes is inadmissible to demonstrate a defendant's propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Section 115-7.3 of the Code provides an exception to this general rule. This statute was enacted to enable courts to admit evidence of other crimes to show a defendant's propensity to commit sex offenses if the requirements of the statute are met. *Donoho*, 204 Ill. 2d at 176.

¶ 49    Section 115-7.3 applies to criminal cases where a defendant is charged with certain enumerated sex offenses, including predatory criminal sexual assault of a child. 725 ILCS 5/115-7.3(a)(1) (West 2016). If a defendant is tried for one of the enumerated sex offenses, the State may introduce evidence that the defendant also committed another specified sex offense, for any relevant purpose. 725 ILCS 5/115-7.3(b) (West 2016). Before other-crimes evidence may be admitted, however, the trial court must engage in a balancing test, weighing the probative value of the evidence against undue prejudice to the defendant. *People v. Ward*, 2011 IL 108690, ¶ 26. In making this determination, the court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of

16

factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2016).

¶ 50 A reviewing court will not reverse the trial court's decision to admit other-crimes evidence absent an abuse of discretion. *Donoho*, 204 Ill. 2d at 182. An abuse of discretion occurs where the trial court's evaluation is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Donoho*, 204 Ill. 2d at 182. Reasonable minds can differ about whether other-crimes evidence is admissible without requiring reversal under the abuse of discretion standard. *Donoho*, 204 Ill. 2d at 186.

¶ 51 We begin with the factual similarities between the allegations made by A.A. and K.S. To be admissible, other-crimes evidence must have some threshold similarity to the crime charged. *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 39. Some factual differences do not defeat admissibility because no two crimes are identical. *Braddy*, 2015 IL App (5th) 130354, ¶ 39. Mere general areas of similarity are sufficient to support admissibility. *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 23. As factual similarities increase, so does the probative value of other-crimes evidence. *People v. Smith*, 2015 IL App (4th) 130205, ¶ 23.

¶ 52 The factual similarities in this case are numerous. Both K.S. and A.A. were nine-year-old girls. The defendant was K.S.'s uncle and A.A.'s great-uncle. The sexual assaults occurred while the defendant was alone with the victims in a caretaking or supervisory role. The sexual assaults were committed in the defendant's bed. He initiated the sexual assaults by having the victims lie on the bed and remove their clothing. In each sexual

17

assault, the defendant inserted his fingers into the victims' vaginas. After the sexual assaults, the defendant asked the victims not to tell anyone about what had happened. In addition to the factual similarities in this case, the trial court noted at the hearing on the parties' motions *in limine* that K.S. testified and appeared to be credible.

¶ 53 When considering proximity in time between the charged offense and the past conduct, courts should evaluate this issue on a case-by-case basis. *Donoho*, 204 Ill. 2d at 183. No bright-line rule controls when a prior offense is too old to be admitted under section 115-7.3. *Braddy*, 2015 IL App (5th) 130354, ¶ 32. Although the passage of time may lessen the probative value of other-crimes evidence, that fact alone does not determine the admissibility of the evidence. *Braddy*, 2015 IL App (5th) 130354, ¶ 32.

¶ 54 Here, the information alleged that the charged conduct against A.A. occurred during the year 2012. K.S.'s allegations allegedly occurred in 1998, approximately 14 years earlier. The defendant contends that this 14-year period undermines the probative value of K.S.'s testimony. Other courts, however, have found similar periods of time did not defeat admissibility. See, *e.g.*, *Donoho*, 204 Ill. 2d at 186 (finding that although 12 to 15 years had elapsed, there were substantial factual similarities regarding the nature of the abuse sufficient to justify the admission of other-crimes evidence); *Braddy*, 2015 IL App (5th) 130354, ¶ 37 (finding that a 20-year time lapse was significant, but the testimony was sufficiently credible and reliable to be probative); and *Smith*, 2015 IL App (4th) 130205, ¶¶ 29 (period of 12 to 18 years). While the 14-year time lapse in the present case is significant, standing alone, it is insufficient to defeat the admissibility of K.S.'s testimony.

¶ 55 The defendant argues that other relevant facts and circumstances warranted the exclusion of K.S.'s testimony: (1) the fact that K.S.'s allegations were investigated by police at the time and found to be unsubstantiated, and (2) the lack of relevant documentation and witnesses available for trial. The defendant asserted that uncharged allegations are less probative than conduct for which a defendant has been tried and convicted and that the jury might have been tempted to convict the defendant because he had "gotten away with it." The defendant further asserted that records related to K.S.'s allegations and the witnesses K.S. made disclosures to were no longer available.

¶ 56 We acknowledge that uncharged allegations may present problems, particularly when a substantial period of time has elapsed between allegations. We cannot say, however, that the trial court abused its discretion in this case. The record shows that the trial court engaged in a meaningful assessment of the probative value of K.S.'s testimony against the undue prejudice to the defendant. The trial court heard K.S.'s testimony at a hearing and found that she appeared to be credible. The trial court considered the proximity in time and observed that the records in this case involving K.S. had apparently been lost or destroyed and that the defendant was apparently unable to interview witnesses that had talked to K.S. about the allegations against the defendant. The trial court found, however, that the probative value of K.S.'s testimony outweighed the prejudicial effect because of the "extreme similarity" between the allegations made by A.A. and K.S.

¶ 57 The prejudicial impact of the evidence was also limited by a number of factors. The defendant had an opportunity to cross-examine K.S. on the record prior to trial. At trial, the defendant was able to establish that the allegations had been investigated and that no

charges were filed against the defendant as a result of the investigation. Finally, the trial court in this case gave a limiting instruction to the jury prior to K.S.'s testimony which stated that the jury was to consider her testimony only for the limited purpose of the defendant's propensity to commit a crime. This instruction was given again prior to the jury's deliberations.

¶ 58 Considering the foregoing, we find that the trial court did not abuse its discretion in admitting K.S.'s testimony pursuant to section 115-7.3 to demonstrate the defendant's propensity to commit predatory criminal sexual assault of a child.

¶ 59 B. Sufficiency of the Evidence

¶ 60 The defendant contends that the evidence was insufficient to support convictions for all 15 counts of predatory criminal sexual assault alleged in the information because the evidence was based on "estimates" made by the victim. We disagree.

¶ 61 A criminal conviction will not be reversed unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When the defendant challenges the sufficiency of the evidence, it is not the reviewing court's function to retry the defendant. *Collins*, 106 Ill. 2d at 261. Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is trier of fact's responsibility to make determinations regarding the credibility of the witnesses and the weight to be accorded to their testimony, to resolve conflicts or inconsistencies in the

evidence, and to draw all reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). A reviewing court will not substitute its judgment for that of the trier of fact on these matters. *Ortiz*, 196 Ill. 2d at 259. A reviewing court, however, is not absolutely bound by the trier of fact's verdict, as the court's ultimate duty is to independently evaluate the reasonableness of the evidence. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 62    The testimony of a single witness is sufficient to convict even when contradicted by the defendant if the testimony is positive and the witness is credible. *People v. Anderson*, 325 Ill. App. 3d 624, 634 (2001). The State is not required to corroborate a victim's testimony with physical or scientific evidence to convict a defendant. *People v. Willer*, 281 Ill. App. 3d 939, 948-49 (1996). Moreover, as the appellate court has observed, other jurisdictions have found that a child victim need not specify the exact number of times the sexual acts occurred, so long as there were " 'some reliable indicia that the number of charged acts actually occurred.' " *People v. Letcher*, 386 Ill. App. 3d 327, 334-35 (2008) (quoting *Rose v. State*, 123 Nev. 194, 203 (2007)).

¶ 63    To sustain a conviction for predatory criminal sexual assault of a child, the State must prove that the defendant was 17 years of age or older, that the defendant committed an act of sexual penetration, and that the victim was under the age of 13. 720 ILCS 5/11-1.40(a)(1) (West 2016). "Sexual penetration" is defined as:

"any contact, however slight, between the sex organ or anus of one person

and an object or the sex organ, mouth, or anus of another person, or any

intrusion, however slight, of any part of the body of one person or of any

21

animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." 720 ILCS 5/11-0.1 (West 2016).

¶ 64 The type of sexual penetration is not an element of the offense, and its inclusion in the charging document is merely surplusage. *People v. Foley*, 206 Ill. App. 3d 709, 718 (1990). If the statutory language used describes specific conduct, the charging instrument need not specify the exact means by which the conduct was carried out. *Foley*, 206 Ill. App. 3d at 718. "The State need only prove that *a* type of sexual penetration occurred beyond a reasonable doubt." (Emphasis in original.) *Foley*, 206 Ill. App. 3d at 718.

¶ 65 Here, A.A. testified that the defendant committed numerous acts of sexual penetration against her during the year of 2012, when she was nine years old. A.A. provided a time frame for when the sexual acts occurred, testifying that they began in February 2012 and ended in October 2012. A.A. testified that while staying at the defendant's apartment, he had A.A. remove her clothes and lie on the bed. She stated the defendant inserted his fingers and tongue into her vagina. A.A. stated that these acts occurred on three to seven occasions but "probably closer to three." A.A. further testified that when the defendant lived in the shed behind A.A.'s house, he inserted his fingers and tongue into her vagina. A.A. recalled that on three occasions, the defendant bound her arms. A.A. also recalled that on two other occasions, the defendant bound both her arms and legs. A.A. testified that when the defendant bound both her arms and legs, he only inserted his fingers into her vagina. A.A. further testified that the defendant committed the sexual acts five times when

22

she was bound in some fashion and another five to eight times when she was not bound. A.A. further estimated that the sexual acts in the shed occurred 10 times, "might be more." When asked to provide a total number of times the defendant inserted his fingers into A.A.'s vagina, A.A. testified "[a]round 15." Thus, the evidence was sufficient to support all 15 convictions for predatory criminal sexual assault of a child.

¶ 66    For the foregoing reasons, the defendant's convictions are affirmed.


¶ 67    Affirmed.